**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ESSEX CAPITAL GROUP, INC.,

     Plaintiff,

v.                                                      Case No: 8:24-cv-0529-KKM-LSG

WARNELL, JR. et al.,

     Defendants.

_____

**<u>ORDER</u>**

    Essex Capital Group, Inc., sues various parties for breach of contract, tortious interference, civil conspiracy, negligent misrepresentation, and negligence. *See* Compl. (Doc. 1). The Wealth Benefits Group (WBG), Travis McCurry as principal at WBG, and Ken Warnell move to dismiss the tortious interference and civil conspiracy claims. Brooks Warnell separately moves to dismiss the civil conspiracy claim. Because the tortious interference claim fails as a matter of law, so too does the civil conspiracy claim, and both are dismissed without prejudice.

**I.   BACKGROUND**

    The Warnell family, through their financial advisor Travis McCurry at WBG, began discussions with Essex concerning financing for a life insurance policy for Brooks Warnell around April of 2023. Compl. ¶ 17.[1] Essex is a "corporate financial advisory firm which primarily focuses on senior and subordinated debt capital raises," and would assist with arranging financing to fund the life

---

[1] At the pleading stage, I accept the plaintiff's allegations as true and "construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

insurance policy. *Id.* ¶¶ 16–17. From the beginning of negotiations, Essex was told to "manage the process of seeking and securing the desired funding through McCurry." *Id.* ¶ 18. Essex, through its managing director Fred Beilstein, was also informed in the month following its introduction that Ken Warnell had power of attorney for Brooks Warnell, the amount of financing sought was between $20,000,000 and $30,000,000, and learned there were properties owned by the Warnells that could serve as collateral. *Id.* ¶ 19. Beilstein also had a Zoom meeting with Ken Warnell and McCurry where they discussed Essex's operations and Brooks Warnell's financing goals. *Id.* ¶ 20.

After these initial meetings, Essex began contacting potential lenders, and received some proposed terms. *Id.* ¶¶ 21–22. In mid-June, Essex contacted McCurry to begin finalizing the terms of Essex and Brooks Warnell's engagement. *Id.* ¶ 22. McCurry requested that the proposed agreement be sent to him first and that "Ken Warnell has [a] [f]inancial POA [for Brooks Warnell] and can sign the [proposed agreement]." *Id.* ¶ 23 (first three alterations original). Around September 12, Essex was informed by McCurry that he was ready to proceed with Essex arranging funding. *Id.* ¶ 24. Three days later, McCurry sent Essex the finalized agreement (Agreement) and it was signed by Ken Warnell in his capacity as attorney-in-fact for Brooks Warnell, and then countersigned five days later by Essex. *Id.* ¶ 25.

The Agreement explained that Essex was to be the "exclusive consultant and advisor for the purposes of furnishing certain corporate finance and financial advisory services." Compl. Ex. A (Doc 1-1) at 2. Other services included conducting a preliminary analysis, providing a method for debt financing,

presenting financing to lenders, and coordinating "lender information flow." *Id*. at 2–3. As required by the Agreement, Brooks Warnell transferred the $7,500 due diligence and preliminary analysis reimbursement payment to Essex. Compl. ¶¶ 25–26. A "contingent success fee" (Fee) was required by the Agreement to "be paid to Essex at the closing of any Financing. . ." *Id*. Ex. A at 3. The amount of the Fee was "2.5% of total capital committed, whether funded at closing or not." *Id*.

Shortly after executing the Agreement, Essex began contacting potential lending associations, one of which being AgSouth Farm Credit, an agricultural credit association. Compl. ¶ 33. Around September 18, 2023, after Beilstein had a conversation with Cassie Justen, a relationship manager at AgSouth, she introduced him to Dewey Newton, Vice President of AgSouth. *Id*. ¶¶ 34–35. On request by the Warnells, Justen would be included throughout the process, though Newton would primarily handle the financing due to its size. *Id*. ¶¶ 37–38. After the introduction, Beilstein and Newton had a "detailed discussion" about the loan. *Id*. ¶ 36. On October 6, 2023, AgSouth sent Beilstein a "Summary of Proposed Terms and Conditions," which was finalized between Essex, AgSouth, and McCurry over the next two months. *Id*. ¶¶ 40–41. To discuss the underwriting process and closing date, Beilstein, McCurry, Newton, and Justen had a meeting on December 6, 2023. *Id*. ¶ 42. Brooks and Ken Warnell did not attend due to issues at one of Brooks Warnell's other properties. *Id*. ¶ 43.

From the December 6 meeting through January 26, 2024, AgSouth worked on its underwriting process, while Beilstein, McCurry, Justen, and Newton continued to touch base weekly on finalizing the loan. *Id*. ¶¶ 45–46. Beilstein and Newton spoke on January 25, 2024, about the closing process and Beilstein

3

informed Newton that Essex would include the Fee invoice in the closing statement. *Id*. ¶ 47. McCurry asked on the same call whether Essex could reduce the Fee and make a charitable donation to a school in the name of WBG. *Id*. ¶ 48. Essex agreed to lower the Fee to 1.9% and donate $10,000 to the requested school. *Id*. ¶ 49. The offer to reduce the fee was never formally accepted by Brooks Warnell. *Id*.

The next day, Newton informed Essex that AgSouth approved a loan in the amount of $30,000,000 for Brooks Warnell. *Id*. ¶ 50. Closing was set for February 5, 2024. *Id*. Beilstein then transmitted the invoice to McCurry with the lowered 1.9% Fee and asked him to provide AgSouth with the invoice so it could be included in the closing statement. *Id*. ¶ 51. In response to McCurry's inquiry, Beilstein confirmed that Newton was aware that the Fee would be included in closing costs, to which McCurry responded "[g]ood deal." *Id*. ¶¶ 52–53. Several days later, on January 30, 2024, McCurry requested that Beilstein send Newton a copy of Essex's invoice, which Beilstein did. *Id*. ¶¶ 54–55. Newton confirmed on a February 1, 2024 phone call with Beilstein that Essex was on the closing statement. *Id*. ¶ 57.

McCurry shortly thereafter confirmed to Beilstein that Justen provided the Warnells with the closing statement that included Essex's Fee. *Id*. ¶ 58. McCurry also noted that Brooks Warnell told Justen he would not close the loan if it included the Fee, but that McCurry would try to "work things out" with the Warnells the following weekend. *Id*. ¶¶ 59–60. Newton sent Essex the closing documents on February 4, 2024, "purposefully omitting the closing statement which had been specifically requested by Essex," and Essex confirmed the time and date of the

closing. *Id*. ¶¶ 61–62. Later that day, McCurry told Beilstein he need not attend the closing in person. *Id*. ¶ 63.

On the day of the closing, Beilstein contacted Newton and Justen requesting the closing statement, but otherwise confirming that everything was in order. *Id*. ¶ 64. McCurry confirmed that he did not have a copy of the closing statement. *Id*. ¶ 66. Beilstein then made multiple attempts throughout the day via email and phone to contact AgSouth about the closing statement, to no avail. *Id*. ¶¶ 67–68. The next day, Beilstein inquired to Justen and Newton whether the loan had closed, and Justen responded that it had, and to contact McCurry for further details. *Id*. ¶ 70. The parties closed the loan "presumably removing Essex from the closing statement," since Essex did not receive the Fee. *Id*. ¶ 72. Essex emailed Ken Warnell, McCurry, Newton, and Justen about the Fee, and McCurry responded he would meet with Ken Warnell and reach back out to Essex. *Id*. ¶¶ 73–74. To date, Essex has not received a follow-up from McCurry, nor has it received the Fee. *Id*. ¶ 75.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a pleading requires "a short and plain statement of the claim showing that the pleader is entitled to relief." This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*,

550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter…that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on its face when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## III.   ANALYSIS

Essex asserts five claims against the defendants. *See* Compl. Count I alleges breach of contract against Brooks Warnell for failing to pay the Fee. *Id.* ¶¶ 76–83. Count II alleges that all defendants engaged in a civil conspiracy to tortiously interfere with Essex's collection of the Fee. *Id.* ¶¶ 84–91. Count III, against defendants Ken Warnell, AgSouth, Newton, Justen, WBG, and McCurry, alleges tortious interference with a contract, asserting that these defendants intentionally and unjustifiably interfered with the Agreement by closing without Essex and prevented Essex from receiving the Fee. *Id.* ¶¶ 92–97. Count IV alleges negligent misrepresentation against Newton and AgSouth for making false statements of fact and omitting material facts regarding Essex's Fee being included on the closing statement, and the payment of the Fee. *Id.* ¶¶ 98–103. Lastly, Essex brings a negligence claim in Count V against AgSouth, alleging AgSouth had a duty to ensure the Fee would be included in the closing statement and AgSouth breached

that duty by causing or permitting the closing of the loan without Essex and therefore the removal of the Fee from the agreement. *Id.* ¶¶ 104–108.

McCurry, WBG, and Ken Warnell move jointly to dismiss counts II and III, the civil conspiracy and tortious interference claims. MTD (MTD I) (Doc. 40). Brooks Warnell moves separately to dismiss count II, the civil conspiracy claim. MTD (MTD II) (Doc. 51). I consider the motions jointly.

**A. Tortious Interference**

The elements of tortious interference with a contract or business relationship are: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 385 (Fla. 4th DCA 1999). "For the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship." *Id.* at 386; *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 (11th Cir. 2001). "Under Florida law, a defendant is not a stranger to a business relationship, and thus cannot be held liable for tortious interference, when it has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed." *Palm Beach Cnty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009). "[A] party's agent cannot tortiously interfere," since they are not third parties or strangers to the business relationship. *M & M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1339 (11th Cir. 2020) (citing *Salit*, 742 So. 2d at 385-86). The exception to this rule is "where malice is the *sole* basis for the interference"—that is, when the defendant is

7

"interfering *solely* out of spite, to do harm, or for some other bad motive." *Ernie Haire Ford*, 260 F.3d at 1294 n.9 (citations omitted).

Essex alleges that all the defendants, except Brooks Warnell, tortiously interfered with the Agreement between Essex and Brooks by preventing Essex's participation in closing the loan, thereby precluding it from receiving the Fee. Ken Warnell, WBG, and Travis McCurry are interested parties under Florida law, and therefore the tortious interference claim against them fails as a matter of law.[2]

As to Ken Warnell, he was not "a stranger to the business relationship" due to his power of attorney on behalf of Brooks Warnell. *Salit*, 742 So.2d at 385. This situation is similar to *Absorbezz LLC v. Hierseman*, where the court denied joinder of a defendant to a tortious interference action because the defendant had power of attorney over plaintiff. No. 19-61442-CIV, 2019 WL 11506034, at *4 (S.D. Fla. Sept. 12, 2019); MTD I at 7. In its response, Essex calls this analogy "entirely distinguishable and inapposite" because Essex nowhere alleged that Warnell had any "control over the funding of the agreement," unlike the defendant in *Absorbezz*, who allegedly refused to fund the principal's contractual commitment, and in any event, the scope of Warnell's power of attorney was nowhere alleged in the complaint so it cannot be decided at the pleading stage. MTD I Resp. (Doc. 46) at ¶¶ 8–9. But throughout Essex's complaint, the allegations suggest Ken Warnell, as attorney-in-fact for Brooks Warnell, acted as an agent for Brooks Warnell, as he "executed" a letter proposal as attorney-in-fact; had a meeting with Essex about "goals of the financing sought by Brooks Warnell"; and was confirmed by McCurry as having a "financial [power of attorney]" for Brooks Warnell.

---

[2] AgSouth, Justen, and Newton do not move to dismiss Count III.

Compl. ¶¶ 12, 20, 23. At the very least, Ken Warnell functioned as an agent for Brooks Warnell, and "a party's agent cannot tortiously interfere[.]" *M & M Realty Partners at Hagen Ranch, LLC*, 982 F.3d at 1339 (quoting *Salit*, 742 So. 2d at 385–86). And there are no allegations that Ken Warnell interfered "*solely* out of spite, to do harm, or for some other bad motive." *Ernie Haire Ford*, 260 F.3d at 1294 n.9. Therefore, the actual power of attorney agreement is not necessary to decide this issue as Essex suggests.

McCurry and WBG are also interested parties. McCurry, as principal of WBG, had at least a supervisory interest in the contract.[3] As described in the complaint, he was "financial advisor to Brooks Warnell, Ken Warnell, and the Warnell family," and "acted as an agent of Brooks Warnell and Ken Warnell." Compl. ¶¶ 17–18. Essex further alleges that it was "instructed to manage the process of seeking and securing the desired funding through McCurry, so as to not overwhelm the Warnell family with requests from multiple parties." *Id*. Further, McCurry, and by extension WBG, had an "interest in managing the loan proceeds as part of their overall wealth management services provided to the Warnell family." *Id.* ¶ 87. These allegations suggest WBG and McCurry were far from "stranger[s] to the business relationship. . ." *Palm Beach Cnty. Health Care Dist.*, 13 So. 3d at 1094; *see Volvo Aero Leasing, LLC v. VAS Aero Services, LLC*, 268 So. 3d 785, 790 (Fla. 4th DCA 2019) (explaining that tortious interference claim failed because defendant management firm "clearly . . . had both a supervisory and financial interest" since it "provided management, consulting and financial advisory services to [the plaintiff]"). Essex attempts to distinguish this caselaw by

---

[3] It is also likely McCurry and WBG had a financial interest, based on McCurry directing Essex to donate to a school in WBG's name. Compl. ¶ 48.

noting that McCurry and WBG are agents of an individual, unlike agents of corporate entities in those cases. Resp. at 7–8. That distinction holds no legal significance and does not reflect a rule in tortious interference law. *See Big Ligas, LLC v. Yu*, No. 20-23719-CIV, 2021 WL 1518993, at *4 (S.D. Fla. Apr. 16, 2021) (ruling that defendant attorney who represented individual was an agent and therefore attorney could not be liable for tortious interference). Nor does Essex allege that the defendants were "interfering *solely* out of spite, to do harm, or for some other bad motive," and therefore the exception does not apply to McCurry and WBG. *Ernie Haire Ford*, 260 F.3d at 1294 n.9.

### B. Civil Conspiracy

To plead civil conspiracy, Essex must sufficiently allege "an agreement between two or more people to achieve an illegal objective, an overt act in furtherance of that illegal objective, and a resulting injury to the plaintiff." *Wainberg v. Mellichamp*, 93 F.4th 1221, 1225 (11th Cir. 2024) (quoting *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc). "Under Florida law, the 'gist of a civil conspiracy is not the conspiracy itself but the civil wrong which is done through the conspiracy which results in injury to the Plaintiff.' " *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007) (quotations omitted**).** In other words, "a civil conspiracy must have as its object the commission of an underlying tort." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281 (11th Cir. 2009).

Essex's allegations of a civil conspiracy as to Ken and Brooks Warnell, Travis McCurry, and WBG cannot survive the defendants' motions to dismiss. Essex alleges that, "acting in concert, [all defendants] conspired and agreed amongst one

another to close the loan . . . without Essex and to prevent Essex from receiving the [] Fee" due to them under the Agreement and that the "[d]efendants took overt actions to surreptitiously close the loan without Essex." Compl. ¶¶ 87, 89. As established above, Ken Warnell, McCurry, and WBG are interested parties to the Agreement. As Essex admits, Brooks Warnell, as the signatory of the contract, certainly is not a "stranger to the business relationship," and therefore cannot have tortiously interfered either. *Salit*, 742 So. 2d at 386; MTD II Resp. (Doc. 52) at 4. "Under [] Florida law, 'tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort[.]' " *In re January 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1203 (S.D. Fla. 2022) (quoting *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994)), *aff'd on other grounds*, 76 F.4th 1335 (11th Cir. 2023). These defendants, as parties and representatives "to the contract with plaintiffs, cannot conspire to tortiously interfere with the contract." *Richardson v. Progressive Am. Ins. Co.*, No. 218CV715FTM99MRM, 2019 WL 2287955, at *8 (M.D. Fla. May 29, 2019) (citing *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1099 (Fla. 1st DCA 1999)).

Essex cites several cases for the proposition that it need not state a claim against these particular defendants for them to be liable for civil conspiracy, since they are allegedly co-conspirators with other defendants that have not challenged the tortious interference claim. *See Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404 (Fla. 2d DCA 2022); *Principal Life Ins. Co. v. Mosberg*, No. 09-22341-CIV, 2010 WL 473042, at *5 (S.D. Fla. Feb. 5, 2010); *Sonic Momentum B, LP v. Motorcars of Distinction, Inc.*, No. 11-80591-CIV, 2011 WL 4738190 (S.D. Fla. Oct. 7, 2011); *Seacoast Banking Corp. of Fla. v. Diemer*, No. 6:20-CV-57-ORL-37LRH, 2020 WL

13031450 (M.D. Fla. June 29, 2020). None of these cases confront the precise issue here: holding someone liable for conspiring to interfere with their own contract. I can find no cases that support conspiring against yourself in the contract context, since that would contradict the third-party requirement in a tortious interference claim—the contracting party is privileged to interfere with their own contract. *See Salit*, 742 So. 2d at 386.

## IV.   CONCLUSION

Count II is dismissed without prejudice as to Ken Warnell, Travis McCurry, and Wealth Benefits Group, as they are each interested parties and cannot be considered third parties in a tortious interference claim. By virtue of Count II's dismissal, Count III is necessarily dismissed without prejudice as to the same defendants and Brooks Warnell. Therefore, the motions to dismiss (MTD I & II) are granted.

Accordingly, the following is **ORDERED:**

1. The Motions to Dismiss, (Doc. 40), (Doc. 51), are **GRANTED.**

2. Count II is **dismissed without prejudice** as to Ken Warnell, Brooks Warnell, Wealth Benefits Group, and Travis McCurry.

3. Count III is **dismissed without prejudice** as to Ken Warnell, Wealth Benefits Group, and Travis McCurry.

**ORDERED** in Tampa, Florida, on December 2, 2024.

Kathryn Kimball Mizelle
United States District Judge